# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FORT MYERS DIVISION

KELLY-ANN REILLY,

    Plaintiff,

v.　　　　　　　　　　　　　　　　　Case No. 2:25-cv-950-KCD-NPM

KASHYAP PATEL, Director of the
Federal Bureau of Investigation ("FBI")
(official capacity), FBI, PAMELA
BONDI, Attorney General of the United
States (official capacity), and the
UNITED STATES DEPARTMENT
OF JUSTICE ("DOJ"),

    Defendants.

_____/

## Motion to Dismiss

Defendants Kashyap Patel, FBI, Pamela Bondi, and DOJ move to dismiss Plaintiff Kelly-Ann Reilly's Complaint (Doc. 10) for lack of subject-matter jurisdiction and failure to state a claim. Fed. R. Civ. P. 12(b)(1), (6). Specifically, Reilly's theories boil down to review of an FBI security clearance investigation and determination. Those matters are categorically beyond Article 3 review. *Navy v. Egan*, 484 U.S. 518 (1988). Apart from that overarching problem, there are other legal defects in the Complaint. For any of these reasons, the Court must dismiss. Reilly disagrees.

## Legal Background

Federal security clearance investigations stem from a longstanding executive order on classified information—requiring employees to be "eligible" with a favorable

background adjudication (among other needs). Exec. Order No. 12968, § 1.2, Access to Classified Information, 60 Fed. Reg. 40245, at 40246 (Aug. 2, 1995). Employees aren't "eligible" unless their "personal and professional history affirmatively indicates loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment, as well as freedom from conflicting allegiances and potential for coercion, and willingness and ability to abide by regulations governing the use, handling, and protection of classified information." *Id.* § 3.1(b), at 40250. Determining if someone meets these requirements is "discretionary" and "based on judgments by appropriately trained adjudicative personnel." *Id.*

The Director of National Intelligence instituted guidelines to assess eligibility decisions (both initial and ongoing) for employee access to classified information. Security Executive Agent Directive 4: National Security Adjudicative Guidelines, at 5 (June 8, 2017) ("SEAD-4"). SEAD-4 "applies to all executive branch agencies that adjudicate security clearance." *N.Y. Times Co. v. U.S. DCSA*, No. 25cv2333 (DLC), 2025 WL 2855339, at *1 (S.D.N.Y. Oct. 8, 2025). These guidelines employ a "whole-person" approach—calling for "a careful weighing of a number of variables of an individual's life to make an affirmative determination that the individual is an acceptable security risk." *Id.* at 6. A favorable adjudication results only when "eligibility is clearly consistent with the interests of national security," and "[a]ny doubt" must be "resolved in favor of the national security." *Id.*

### Factual Background

While this case has a convoluted background with surely disputed facts, the

legal issues are clean. There is no need to sift through bizarre disputes like whether Reilly denied that terrorist attacks occurred on September 11th. (Doc. 10 at 22-23); (Ex. 3 at 3). The case fails at the outset because the parties agree this Complaint "arises from the FBI's security-clearance process" and "revocation of [Reilly's] security clearance." (Doc. 10 at 2-3). Those matters are beyond Article 3 jurisdiction.

Reilly worked for many years as an FBI analyst. (Doc. 10 at 7). To do her job, she held a security clearance. (Doc. 10 at 7). While the Complaint is a bit unclear, holding a security clearance was required for Reilly's work at the FBI. *See* (Ex. 1 at 3).

Shortly after the 2020 presidential election, Reilly told a supervisor about her beliefs—concerning electoral irregularities and some judicial process to overturn the election. (Doc. 10 at 7-8). According to Reilly, she neither acted on these beliefs in a professional capacity nor spoke about them publicly. (Doc. 10 at 7-8). Roughly one month later, the FBI suspended Reilly's security clearance. (Doc. 10 at 8); (Ex. 1 at 3).

Every allegation stems from that initial security clearance suspension, resulting investigation, final revocation, and eventual recission. As far as the law is concerned, that's case closed. Under *Egan*, this action can go no further.

The FBI continued its security clearance investigation. (Doc. 10 at 9-13); (Ex. 2 at 3). Ultimately, the FBI revoked Reilly's clearance. (Ex. 2 at 3). She appealed. (Doc. 10 at 13). Then, in October 2021, Reilly retired from the FBI. (Doc. 10 at 17-18). Still, the appeal process continued with the FBI denying Reilly's reconsideration and setting a hearing with the DOJ's Access Review Committee ("ARC"). (Doc. 10 at 19).

Shortly before the ARC hearing, the FBI provided notice that it would rescind

3

Reilly's security clearance revocation. (Doc. 10 at 20). In June 2025, the FBI formally rescinded the revocation since there was "no reason to further consider [Reilly's] eligibility for a security clearance after [she] retired." (Doc. 10 at 21); (Ex. 3 at 3).

This action follows.

## Legal Standard

Courts must dismiss when they lack subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). In a facial challenge, "the Court merely looks to see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).

"[U]nder Rule 12(b)(6), the plaintiff must allege sufficient facts to state a claim for relief that is plausible on its face." *Andre v. Clayton Cnty., Ga.*, 148 F.4th 1282, 1291 (11th Cir. 2025). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## Discussion

To start, we address the Exhibits briefly. Then, the analysis turns to the core problem—Reilly challenges decisions related to a security clearance investigation and decision. From there, the Motion walks through the Complaint's other defects.

## A.    Exhibits Proper

Before beginning, the Court should consider the Exhibits to this Motion without converting to summary judgment. (Exs. 1; 2; 3). The Exhibits are all referenced in the

Complaint, central to Reilly's theory, and undisputed (i.e., authentic). *Baker v. City of Madison, Ala.*, 67 F.4th 1268, 1276 (11th Cir. 2023)

First, Reilly references—with direct quotes—Exhibits 1, 2, and 3. (Doc. 10 at 8-9, 13-14, 21-22). Second, those records are central to her claims as they represent the suspension, revocation, and eventual rescission of the security clearance decisions at issue. And third, the records are undisputed since they are authentic; while the legal significance and impact may be disputed, these Exhibits are what they purport to be.

With that resolved, the analysis shifts to the real dispute.

## B.    No Basis to Review a Security Clearance Decision

No matter how Reilly tries to dress up her claims, they all come down to a theory of retaliation, discrimination, or improper treatment due to security clearance suspension and revocation. Such claims are flatly outside the scope of judicial review:

> The United States Supreme Court has made clear that a decision concerning the issuance or non-issuance of security clearance is a matter within the purview of the executive and not to be second-guessed by the judiciary unless Congress has specifically provided otherwise. *Department of the Navy v. Egan*, 484 U.S. 518 (1988). To review the initial stages of a security clearance determination is to review the basis of the determination itself regardless of how the issue is characterized.

*Hill v. White*, 321 F.3d 1334, 1336 (11th Cir. 2003). In short, the Court cannot review any of Reilly's claims without deciding whether her security clearance suspension or revocation were appropriate. These questions are beyond Article 3's purview.

The Supreme Court rejected this type of case long ago. *Egan*, 484 U.S. 518. At bottom, *Egan* "held that no reviewing court has authority to review the substance of an underlying security clearance determination when reviewing an adverse

5

employment action." *E.g.*, *Murphy v. Army*, 769 F. App'x 779, 782 (11th Cir. 2019) (distilling *Egan*). The only exception is where "Congress specifically has provided otherwise." *Egan*, 484 U.S. at 530.

Under basic separation-of-powers principles, *Egan* explained, the duty to control access to classified information rests with the Executive agency responsible for the information—which derives that power from the President's authority under Article 2. *Id.* at 527-28. Security clearance decisions are an "inexact science," requiring "necessary expertise" to make a "[p]redictive judgment" about security risks. *Id.* at 529. The Supremes summed up their thinking:

> Certainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence. Nor can such a body determine what constitutes an acceptable margin of error in assessing the potential risk.

*Id.*

In the decades since *Egan*, courts around the country followed its simple command—holding they cannot review claims that second-guess a security clearance determination. *E.g.*, *Bennett v. Chertoff*, 425 F.3d 999 (D.C. Cir. 2005) (holding "employment actions based on denial of security clearance are not subject to judicial review"); *Hegab v. Long*, 716 F.3d 790, 794 (4th Cir. 2013) (collecting cases); *El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 183-86 (3d Cir. 2010); *Perez v. FBI*, 71 F.3d 513, 514 (5th Cir. 1995); *Ryan v. Reno*, 168 F.3d 520, 523 (D.C. Cir. 1999).

Nor can plaintiffs circumvent this prohibition through artful pleading that

purports to challenge the clearance process itself apart from the ultimate decision. *Becerra v. Dalton*, 94 F.3d 145, 149 (4th Cir. 1996) (A "distinction between the initiation of a security investigation and the denial of a security clearance is a distinction without a difference."); *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 853 (10th Cir. 2007) (agreeing and explaining review of the clearance decision circumstances "is to review the basis of the determination itself"). Indeed, the Eleventh Circuit held a challenge to the initiation of a security clearance investigation—even if divorced from the final determination—is beyond Article 3 competence. *Hill*, 321 F.3d at 1335-36. As then-Judge Kavanaugh later agreed, any "slicing and dicing of the security clearance process into reviewable and unreviewable portions is nowhere to be found in *Egan*." *Rattigan v. Holder*, 689 F.3d 764, 774 (D.C. Cir. 2012) (Kavanaugh, J., dissenting).

In the context of real national security determinations regarding entrustment of the Government's most confidential information, hypersensitive formalisms will not do. *Hill v. Air Force*, 844 F.2d 1407, 1411 (10th Cir. 1988) ("[I]f the statutory constraints imposed in *Egan* can be bypassed simply by invoking alleged constitutional rights, it makes the authority of *Egan* hardly worth the effort."). To that end, circuits rejected just about every possible creative theory crafted to overcome *Egan*'s prohibition. *Brazil v. Navy*, 66 F.3d 193, 196-98 (9th Cir. 1995) (Title VII and *Bivens*); *Oryszak v. Sullivan*, 576 F.3d 522, 525-26 (D.C. Cir. 2009) (APA); *Weber v. United States*, 209 F.3d 756, 759-60 (D.C. Cir. 2000) (whistleblower); *Guillot v. Garrett*, 970 F.2d 1320, 1324-26 (4th Cir.1992) (Rehabilitation Act).

So courts don't look at what label a lawyer uses; instead, each case "requires a more detailed analysis of whether the judgment at issue is of the type that *Egan* intended to shield from judicial review." *Mowery v. Nat'l Geospatial Intel. Agency*, 42 F.4th 428, 436 (4th Cir. 2022). This case presents only those issues.

Between pleadings, Reilly stripped out the most problematic request to "[d]eclare that the security clearance revocation, permanent suspension, and constructive discharge lacked lawful basis." (Doc. 1 at 37). Albeit couched in different phrasing, the problems remain despite this omission. Now, Reilly asks the Court to declare FBI's conduct violated the First and Fifth Amendments, reinstate her, and expunge all records related to FBI's alleged "unconstitutional security clearance revocation." (Doc. 10 at 34). To do all this would still require the Court to examine the underlying bases and determinations made during FBI's security clearance suspension, investigation, revocation, and resulting appeal process. Yet to decide if security clearance was appropriately suspended or revoked is "precisely the type of review that *Egan* prohibits." *Reinbold v. Evers*, 187 F.3d 348, 358 (4th Cir. 1999). In fact, reinstatement would require the Court to somehow adjudicate Reilly's background investigation favorably then provide a security clearance.

So the answer is clear, right? Enter an "enigmatic decision" called *Webster v. Doe*, 486 U.S. 592 (1988). *Zummer v. Sallet*, 37 F.4th 996, 1008 (2022). It's on this peg that Reilly hangs her hat. But *Webster* cannot hold *Egan*'s weight.

*Webster* came about four months after *Egan*. To be sure, it seemed to create some tension between those decisions. Namely, it held Congress must clearly "preclude

8

consideration of colorable constitutional claims" to prohibit review. *Webster*, 486 U.S. at 603. But upon close inspection, *Egan* and *Webster* coexist here because *Webster* simply doesn't apply. Crucially, *Webster* did not concern a security clearance decision at all, and it relied on a statutory analysis to a scheme not relevant here.

In *Webster*, plaintiff told the CIA that he was gay. Under 50 U.S.C. § 403(c), the CIA determined that plaintiff's sexual orientation "posed a threat to security." *Id.* at 595. After plaintiff refused to resign, the CIA terminated his employment. While he would receive positive future job recommendations, the CIA promised to inform any employer of its belief that plaintiff's sexual orientation "presented a security threat"— but only if such a job required a security clearance. *Id.*

Nothing about *Webster* required review of security clearance decisions because the CIA made no determination in that case. It simply warned about future disclosure of its belief that plaintiff's orientation was a threat if some job prospect required a security clearance. So the *Webster* majority did not see fit to cite *Egan* (much less analyze it). Nor did the *Webster* concurrence or dissent understand its impact to possibly upset *Egan*. They simply mentioned *Egan* in passing for general principles of Executive primacy on sensitive, discretionary questions of national security.

What's more, this *Webster* fact pattern played out within the distinct context of a CIA Director's authority to terminate employment of any employee if deemed "necessary or advisable in the interests of the United States." *Id.* at 594 (quoting 50 U.S.C. § 403(c)). That scheme is inapplicable here. In *Webster*, the CIA never revoked

or suspended plaintiff's security clearance; rather, it suspended then terminated plaintiff under the Director's authority to make employment decisions. Here, the FBI suspended then revoked Reilly's security clearance—before rescinding—all based on its assessment of the underlying facts and merits, which the Court cannot review.

In sum, this isn't the case to read *Webster*'s tea leaves; it demands applying *Egan*.

Courts parsed and reconciled the distinctions between *Egan* and *Webster* by holding actual security clearance challenges—like here—are beyond Article 3. *E.g.*, *Zummer*, 37 F.4th at 1008-12; *Lee v. Garland*, 120 F.4th 880, 888 (D.C. Cir. 2024). True, some courts overcorrected through judicially created rules to allow "constitutional claims arising from the clearance revocation process" divorced from any clearance decision. *El-Ganayni*, 591 F.3d at 183 (cleaned up) (collecting cases). The Eleventh doesn't agree, reads *Egan* for what it says, and broadly prohibits claims from the initiation of the clearance investigation through the decision itself. *Hill*, 321 F.3d at 1336; *see also Mowry*, 42 F.4th at 438 ("But as *Becerra* recognized, it is not possible to disentangle the early stages of a security assessment from the end result.").

Since the Eleventh rejects Reilly's theory, what other circuits do on this issue is irrelevant. But we're here anyway, so let's chat about other courts.

Even in those circuits providing limited avenues to challenge discrete constitutional process concerns, a theory cannot "question the motivation behind the decision to deny [a] security clearance." *El-Ganayni*, 591 F.3d at 183 (cleaned up) (collecting cases). Said different, a claim is never cognizable when it demands an agency explain clearance decisions and support agency actions or decision-making

10

with facts. *Id.* at 185; *see also Sanchez v. Dep't of Energy*, 870 F.3d 1185, 1194-95 (10th Cir. 2017); *Zeinali v. Raytheon Co.*, 636 F.3d 544, 549-52 (9th Cir. 2011).

The core of Reilly's theory challenges motivations and justifications for the FBI's security clearance investigation and decisions. Indeed, the Complaint is replete with allegations directly attacking the basis of her clearance investigation, suspension, and revocation. In Reilly's own words, she builds her case on the theory that FBI's security clearance process was a "politically motivated," (Doc. 10 at 3), "pretextual," (Doc. 10 at 20), "ideological inquisition," (Doc. 10 at 9-10), "to probe [her] political beliefs," (Doc. 10 at 10), in "retaliation," (Doc. 10 at 3), for being "politically affiliated with President Trump," (Doc. 10 at 26).

To be clear, the FBI denies it made any decisions or took any actions related to Reilly's security clearance for politically motivated or retaliatory reasons. For the case to proceed, a factfinder needs to weigh and determine whether that assertion is accurate (or the FBI would need to support it with evidence at summary judgment). Even in more plaintiff-friendly circuits, there is just no way for this case to continue without requiring the FBI to defend and explain its security clearance determinations, along with the underlying motivations for its investigation. *El-Ganayni*, 591 F.3d at 185. Doing that directly violates *Egan* and basic separation-of-powers principles.

As explained, the case cannot continue as it asks the Court to do what *Egan* prohibited—reviewing security clearance investigations and decisions. If the Court is inclined to entertain these claims, a separate matter bars suit entirely.

## C.   No Jurisdiction Under Political Question Doctrine

"The political question doctrine recognizes that some issues cannot be resolved by federal courts." *Lee*, 120 F.4th at 888. After all, "Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803). National security is "a quintessential source of political questions." *Lee*, 120 F.4th at 891 (cleaned up).

A nonjusticiable political question may exist if a dispute presents any of the six *Baker* factors, which include these two:

> [(1)] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [(2)] a lack of judicially discoverable and manageable standards for resolving it.

*Baker v. Carr*, 369 U.S. 186, 217 (1962); *see also McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1357-58 (11th Cir. 2007). "A case may be dismissed on political question grounds if—and only if—the case will require the court to decide a question possessing one of these six characteristics." *McMahon*, 502 F.3d at 1358.

The first two *Baker* inquiries are "the most important." *Schieber v. United States*, 77 F.4th 806, 810 (D.C. Cir. 2023) (cleaned up). And as the DC Circuit just held, this case thoroughly flunks the test on both. *See Lee*, 120 F.4th at 889-95.

First, "The Constitution commits the question whether to deny or revoke a security clearance to the Executive Branch." *Lee*, 120 F.4th at 891. Executive "authority to classify and control access to information bearing on national security

12

and to determine whether an individual is sufficiently trustworthy to occupy a position" requiring clearance flows from Article 2, Section 2. *Egan*, 484 U.S. at 527. Specifically, the Constitution entrusts the President—as Commander in Chief—with discretion over these questions. *Id.* George Washington himself understood this concept of legitimate Article 2 power. *Lee*, 120 F.4th at 884, 891. So any case concerning security clearance decisions related to a specific individual encroaches onto turf textually committed to the Executive. *Id.* at 891-93.

Second, "Adjudicating constitutional challenges to clearance decisions often would present" disputes with "a lack of judicially discoverable and manageable standards for resolving the question." *Id.* at 893 (cleaned up). As *Egan* said, clearance inquiries and decisions require expert "[p]redictive judgment" about future conduct based on "an inexact science at best." 484 U.S. at 529 (citation omitted). "Certainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment." *Id.* "Yet constitutional challenges often require courts to make nuanced judgments about the challenged government action: What was its motivation?" *Lee*, 120 F.4th at 893. "In the context of clearance decisions, a court could not answer such questions without doing what *Egan* said is not reasonably possible." *Id.* at 893-94.

Upon review, Reilly's theory obviously presents nonjusticiable political questions. This case is a direct attack on the motivations behind the FBI's suspension and revocation of Reilly's security clearance. There are no judicial standards by which the Court could analyze the FBI conduct or decision-making without "directly

reviewing the merits of [its] decision, which *Egan* prohibits." *Id.* at 894 (cleaned up). Nor could judicial review occur without infringing on the textually committed Executive power to conduct clearance investigations and "determine what constitutes an acceptable margin of error in assessing the potential risk." *Egan*, 484 U.S. at 529. Notably, Reilly seeks backpay and reinstatement—i.e., the precise relief aimed at second-guessing the security clearance suspension and revocation. *Lee*, 120 F.4th at 894; *see also Gebert v. Dep't of State*, No. 22-cv-2939 (DLF), 2025 WL 1768044, at *2 (D.D.C. June 26, 2025) (dismissing because the relief sought was "inseparable from the Department's decision to revoke [plaintiff's] security clearance").

If Congress wants to strike a different balance and vest federal courts with review over security clearance matters, it may do that. *Egan*, 484 U.S. at 530. "Until Congress does so, however, we must apply *Egan* according to its terms." *Rattigan*, 689 F.3d at 776 (Kavanaugh, J., dissenting).

In sum, the political question doctrine bars any portion of the Complaint that could possibly survive *Egan*'s clear command to dismiss. But when it comes to defects with the Complaint, there's more.

## D.    No Jurisdiction Over Constitutional Claims for Monetary Relief

Reilly expressly seeks damages in the form of backpay and unidentified "monetary . . . relief." (Doc. 10 at 34). Two immovable objects block money damages here: (1) sovereign immunity and (2) the Civil Service Reform Act ("CSRA").

### 1.    Sovereign Immunity

People cannot simply sue the Government for money damages whenever they'd

14

like. Sovereign immunity must always be overcome before pursuing an action. *E.g.*, *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). "Sovereign immunity is jurisdictional." *Id.* "Indeed, the terms of the United States' consent to be sued in any court define that court's jurisdiction to entertain the suit." *Id.* (cleaned up).

It is well established that the Government "has not consented to be sued for damages based either on constitutional violations or on its failure to carry out a federal statutory duty in the conduct of its own affairs." *Cofield v. United States*, 64 F. Supp. 3d 206, 213 (D.D.C. 2014) (cleaned up). Nor are their independent constitutional claims for money damages against federal agencies. *E.g.*, *Clark v. Library of Congress*, 750 F.2d 89, 102-04 (D.C. Cir. 1984); *Benoit v. USDA*, 608 F.3d 17, 20-21 (D.C. Cir. 2010).

Parties can seek damages for constitutional violations through *Bivens* claims. *E.g.*, *Johnson v. Terry*, 119 F.4th 840, 846-47 (11th Cir. 2024) ("Claims for money damages against federal officials and employees who have committed constitutional violations are known as *Bivens* claims."). But *Bivens* claim here would surely fail as this is a new context with untold separation-of-powers factors counseling that the Judiciary is less equipped to form a cause of action. *See Johnson*, 119 F.4th at 851-52.

So what Reilly tries bringing is a backdoor *Bivens*—simply swapping out federal officials for agencies to seek money damages for alleged constitutional deprivations, nonetheless. Yet that's precisely what the Supreme Court rejects. *Meyer*, 510 U.S. at 486 (refusing to recognize "a damages remedy against federal agencies" or to extend "*Bivens* to agencies of the Federal Government"). Indeed, nobody would ever sue an

15

individual officer under *Bivens* if she could sue the deepest pocket around (i.e., the United States). *Id.* at 485. Simply put, "federal agencies cannot be sued for damages arising from an agency's alleged violation of a plaintiff's constitutional rights." *Scaff-Martinez v. BOP*, 160 F. App'x 955, 957 (11th Cir. 2005).

Reilly does not—and cannot—point to any waiver of sovereign immunity for money damages from alleged constitutional deprivations. They are, therefore, unrecoverable. *E.g.*, *Gilliam v. VA*, 822 F. App'x 985, 991-92 (11th Cir. 2020).

2.   CSRA

"The CSRA established a comprehensive system for reviewing personnel action taken against federal employees." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5 (2012) (cleaned up). This statutory scheme is the "exclusive remedy for damage claims of federal employees seeking redress for alleged constitutional violations arising out of the employment relationship." *Sarullo v. USPS*, 352 F.3d 789, 794-95 (3d Cir. 2003). For instance, the Supreme Court held the CSRA barred *Bivens* claims based on First Amendment retaliation. *Bush v. Lucas*, 462 U.S. 367, 390 (1983).

Not even Reilly's allegations of constitutional violations are enough to remove this action from the CSRA's purview. In fact, "the MSPB [(Merit Systems Protection Board)] routinely adjudicates some constitutional claims, such as claims that an agency took adverse employment action in violation of an employee's First or Fourth Amendment rights, [so] these claims must be brought within the CSRA scheme." *Elgin*, 567 U.S. at 12. No matter how she characterizes her claims, the CSRA bars all monetary relief for Reilly.

16

Any reliance on *Webster* misunderstands this statutory scheme. The Supremes confirmed as much over a decade ago. *Elgin*, 567 U.S. at 8-10. There is "a necessary predicate to the application of *Webster*'s heightened standard: a statute that purports to 'deny any judicial forum for a colorable constitutional claim.'" *Elgin*, 567 U.S. at 9 (quoting *Webster*, 486 U.S. at 603). While "the CSRA does not foreclose all judicial review of [plaintiff's] constitutional claims," it "merely directs that judicial review shall occur in the Federal Circuit." *Elgin*, 567 U.S. at 10.

Perhaps Reilly will say the CSRA does not apply to her. *See* 5 U.S.C. § 7511(b)(8) (excluding FBI employees). While likely true, it's beside the point. *See Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) ("FBI employees are generally excluded from CSRA provisions."). Even for employees precluded from seeking relief under the CSRA—like Reilly—the scheme still prevents a claim for money damages. *Zummer*, 37 F.4th at 1007 ("We held that the CSRA still precluded federal court jurisdiction despite not providing for review of that constitutional claim."). As then-Judge Roberts recognized decades ago, circumstances arise for certain federal employees where "the CSRA provides no relief and precludes other avenues of relief." *Graham*, 358 F.3d at 935. Put different, the CSRA's "deliberate exclusion of employees in [plaintiff's] service category from the provisions establishing administrative and judicial review for personnel action of the sort at issue here prevents [plaintiff] from seeking review" altogether. *United States v. Fausto*, 484 U.S. 439, 455 (1988).

"Remember: *Egan* was an interpretation of the CSRA." *Zummer*, 37 F.4th at

17

1007. "So we are bound to conclude that Congress did not provide for security-clearance decisions to be reviewed—under the CSRA or otherwise." *Id.*

Where the CSRA bars an employee entirely (as here), the Government slightly modifies its position. Specifically, the Government contends judicial review is perhaps possible for colorable constitutional claims seeking *equitable* relief. To be sure, this is DOJ policy guidance lowly AUSAs must follow, which is not binding on the Court. Still, even under that more lenient interpretation, the CSRA bars Reilly from recovering monetary damages—including backpay. *Runnels v. FBI*, No. 25-1202 (BAH), 2025 WL 3089526, at *3-5 (D.D.C. Nov. 5, 2025) (holding FBI employee with suspended security clearance not entitled to judicial review of claim for backpay).

Quick note: any Back Pay Act claim fails out of hand. The Tucker Act requires filing such claims over $10,000 in the Court of Federal Claims. 28 U.S.C. § 1491; *Smalls v. United States*, 471 F.3d 186, 189 (D.C. Cir. 2006). And regardless, Back Pay Act claims fail when they are subject to the CSRA. *Fausto*, 484 U.S. at 455.

In sum, sovereign immunity and the CSRA preclude any claim for money damages here. But there are problems with the equitable relief sought too.

### E.    No Constructive Discharge or Reinstatement

Reilly accepted early retirement and voluntarily resigned in October 2021. (Doc. 10 at 17-18). Even if she subjectively considers her circumstances a constructive discharge, the law disagrees. So Reilly has no standing to seek reinstatement.

In this Circuit, "the general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an

18

involuntary resignation, then the employer has encompassed a constructive discharge." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 802 (11th Cir. 2005) (cleaned up). Crucially, however, "that one of the possible outcomes is [plaintiff] would lose his job alone is not sufficient to establish the intolerable conditions sufficient to justify a finding of constructive discharge." *Id.* at 806. After all, "the possibility that a plaintiff may not remain employed is not by itself enough to place a reasonable person in the position of 'quit or be fired.'" *Id.*

Constructive discharge is a stringent standard. *Austin v. FL HUD Rosewood LLC*, 791 F. App'x 819, 824-25 (11th Cir. 2019). It requires "pervasive" discrimination and a "workplace permeated with discriminatory intimidation, ridicule, and insult." *Id.* (cleaned up). "The standard for proving constructive discharge is higher than the standard for proving a hostile work environment." *Hipp v. Liberty Nat'l Life Ins.*, 252 F.3d 1208, 1231 (11th Cir. 2001). "An employee who accepts the severance package rather than wait to see if he can remain employed cannot claim that he was constructively discharged." *Rowell*, 433 F.3d at 806.

Here, no facts could clear the heightened threshold of constructive discharge. Reilly made the economic choice to accept early retirement during the appeal process of her security clearance revocation. Even where—as here—the resignation follows the revocation of security clearance, constructive discharge doesn't apply. *Bierly v. DOD*, No. 23-cv-2386-RCL, 2024 WL 4227154, at *8 (D.D.C. Sept. 18, 2024); *Hendrix v. Napolitano*, 77 F. Supp. 3d 188, 195 (D.D.C. 2015).

Nor did enough time pass for Reilly's resignation to qualify as constructive

19

discharge. *See Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) ("A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation."). Reilly took early retirement only about four months after the revocation of her security clearance and during her appeal. At that point, the FBI was still engaged with reviewing the merits of the clearance decision.

Apart from all that, this Court cannot order approval of security clearance; so there is no way to reinstate Reilly in a position requiring clearance. *Bierly*, 2024 WL 4227154, at *6-7. The only thing the Court could theoretically do is make advisory declarations about alleged past injuries—which do not provide standing.

Because there was no constructive discharge, Reilly cannot seek reinstatement. To look at the individual claims further reveals Reilly cannot state them either.

**F.      First Amendment Claim Not Cognizable**

There is no First Amendment cause of action. To state a First Amendment retaliation claim, plaintiff must show (among other requirements) "protected activity was a substantial or motivating factor in the defendant's conduct." *AFGE, AFL-CIO v. Trump*, 148 F.4th 648, 654 (9th Cir. 2025) (citation omitted). Again, this element goes directly to unreviewable motivations of the FBI's security clearance investigation and decision-making. There is simply no way to state a viable First Amendment claim without facially violating *Egan*.

What's more, Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment." *Brown v. GSA*, 425 U.S. 820, 835 (1976); *Mays v. USPS*, 122 F.3d 43, 45 n.2 (11th Cir. 1997). Since Reilly failed to bring or exhaust a

20

Title VII claim, any First Amendment theory may fail as preempted. *See Belhomme v. Widnall*, 127 F.3d 1214, 1217 (10th Cir. 1997).

The First Amendment claim fails; so too does the Fifth.

**G.     Due Process Claims Not Cognizable**

To state a cognizable due process claim, plaintiff must identify an established property or liberty interest. *E.g.*, *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1462 & n.38 (11th Cir. 1991). Reilly can't do that.

For starters, "It should be obvious that no one has a 'right' to a security clearance." *Egan*, 484 U.S. at 528. So claimants cannot allege a property or liberty interest derived from holding a security clearance. *E.g.*, *Painter v. FBI*, 694 F.2d 255, 257 (11th Cir. 1982) ("[T]here is no property interest created by statute or regulation in [plaintiff's] employment with the FBI."); *Jamil v. DOD*, 910 F.2d 1203, 1209 (4th Cir. 1990); *Dorfmont v. Brown*, 913 F.2d 1399, 1403 (9th Cir. 1990). As one court put it, "every court of appeals which has addressed the issue has ruled that a person has no constitutionally protected liberty or property interest in a security clearance or a job requiring a security clearance." *Stehney v. Perry*, 101 F.3d 925, 936 (3d Cir. 1996); *see also Sanchez*, 870 F.3d at 1198 ("In the *Egan* context, it's well-established that people do not possess a protected liberty or property interest in security clearances."); *Hesse v. Dep't of State*, 217 F.3d 1372, 1381 (Fed. Cir. 2000).

Literally within weeks of *Egan*, courts started rejecting Reilly's exact theory of a property or liberty interest rooted in administrative procedures for conducting

21

security clearance investigations and determinations:

> A security clearance is merely temporary permission by the Executive for access to national secrets. . . . The notion of an individual property right in access to the nation's secrets—by definition a limitation on Executive discretion—is utterly inconsistent with [separation-of-powers] principles. Whatever expectation an individual might have in a clearance is unilateral at best, and thus cannot be the basis for a constitutional right.
>
> [Plaintiff] emphasizes the existence of procedural rules which have been developed by the Department of Defense and the various military agencies relating to the suspension and potential revocation of an existing clearance. . . . Those procedures are not the type of "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." The procedures are administrative devices which are indeed intended to promote fairness and safeguard the rights of individual employees, but are not intended thereby to diminish Executive authority rooted in Executive responsibility.

*Hill*, 844 F.2d at 1411-12 (internal citations omitted). In the decades since, judges continued recognizing this is the only reasonable reading of *Egan*. *Dormont*, 913 F.2d at 1403-04; *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) (A cognizable "cannot be defined by the procedures provided for its deprivation.").

Denial or revocation of security clearance isn't deprivation of the right to work; instead, it withholds specific employment requiring that authorization. *Dormont*, 913 at 1403. Put different, "If there is no protected interest in a security clearance, there is no liberty interest in employment requiring such clearance." *Id.* So Reilly cannot state a due process claim. *E.g.*, *Palmieri v. United States*, 72 F. Supp. 3d 191, 206-07 (D.D.C. 2014). (reasoning "the right to earn a living does not extend to jobs requiring a security clearance" (cleaned up)).

Notably, reputational harm alone is insufficient to support a due process claim.

22

*Bradshaw v. FAA*, 8 F.4th 1215, 1226-27 (11th Cir. 2021). There must be "stigma plus." *Id.* Specifically, plaintiff must "show that the government official's conduct deprived the plaintiff of a previously recognized property or liberty interest in addition to damaging the plaintiff's reputation." *Id.* (citation omitted). Since she has no separate, cognizable interest, all that Reilly can point at is alleged stigma or reputational harm. That isn't enough. *E.g.*, *Magassa v. Mayorkas*, 52 F.4th 1156, 1169 (9th Cir. 2022) ("Without a right to a security clearance, *Egan*, 484 U.S. at 528, or a job that requires one, *Dorfmont*, 913 F.2d at 1403, [plaintiff's] procedural due process claim fails" despite alleging reputational harm.).

There's a separate reason the stigma-plus claim fails. This doctrine requires a public employer to publish harmful statements. *Loudermill*, 470 U.S. at 547 n.13. A statement must be "made public." *Bishop v. Wood*, 426 U.S. 341, 348 (1976).

Internal dissemination between federal agencies of information related to security clearance matters "is not stigmatizing and does not infringe upon constitutional liberty interests." *Doe v. Cheney*, 885 F.2d 898, 910 (D.C. Cir. 1989); *see also Perry v. FBI*, 781 F.2d 1294, 1302 (7th Cir. 1986). Even if between different agencies, this intra-governmental dissemination is not "public" in a way that supports a claim. *Elhady v. Kable*, 993 F.3d 208, 225 (4th Cir. 2021); *Alcorn v. La Barge, WY*, 784 F. App'x 614, 619 (10th Cir. 2019) (collecting cases). For example, putting someone on TSA's terrorist watchlist—which is widely shared on a Government database— would not qualify as public disclosure. *Long v. Bondi*, 151 F.4th 503, 518 (4th Cir.

23

2025). This rule naturally applies to stigma-plus claims arising from security clearance denials. *Gill v. DOJ*, No. 15-824 (RMC), 2016 WL 3982450, at *6 (D.D.C. July 22, 2016); *M.K. v. Tenet*, 196 F. Supp. 2d 8, 15 (D.D.C. 2001).

Here, the FBI did not publish any harmful statements that could support a cognizable due process claim. In its recission letter to Reilly, the FBI noted investigation results "may be made known to other federal government agencies if you apply for employment requiring a security clearance." (Ex. 3 at 4). There is no indication Reilly applied or the FBI made such statements. *Bishop*, 426 U.S. at 348 ("Since the former communication was not made public, it cannot properly form the basis for a claim that petitioner's interest in his 'good name, reputation, honor, or integrity' was thereby impaired." (footnote omitted)). Likewise, a requirement for the FBI "to update Scattered Castles to reflect that [she] retired while under inquiry," is not a public statement. (Ex. 3 at 4). Nor would it be sufficient to state a claim.

What's more, any due process claim alleged was rendered moot when the FBI rescinded the revocation. The only possible harm at this point would relate to unidentified, future job prospects that might hypothetically require security clearances. Such imagined injuries, however, cannot meet Article 3's standing requirements. *See Spokeo, Inc. v. Robbins*, 578 U.S. 330, 340 (2016) (holding injuries must be "concrete"— i.e., they "must actually exist" to be "real, and not abstract" (cleaned up)).

Due process fails. Neither declarations nor mandamus can salvage the case.

## H.   Declaratory and Mandamus Claims Insufficient Alone

"The federal Declaratory Judgment Act is procedural in nature and is not an

independent basis for federal jurisdiction." *Great Lakes Ins. SE v. Ming & Kwang Dev. Corp.*, 763 F. Supp. 3d 1364, 1367 n.4 (M.D. Fla. 2025). A court can simply declare rights during "a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201(a). With no other jurisdictional basis, there is no actual controversy within which the Court can declare anything.

Even if it could, entertaining dec actions is within the Court's discretion. 28 U.S.C. § 2201(a) (stating courts "may declare the rights"). Given the significant issues identified above, the Court should not issue declarations on this clearance matter.

Under the Mandamus Act, "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. "A writ of mandamus is an extraordinary remedy available only in the clearest and most compelling of cases." *Alfassi v. Garland*, 614 F. Supp. 3d 1252, 1255 (S.D. Fla. 2022). "Mandamus is appropriate only if (1) the plaintiff has a clear right to the relief requested; (2) the defendant has a clear duty to act; and (3) no other adequate remedy is available." *Serrano v. U.S. Att'y General*, 655 F.3d 1260, 1263 (11th Cir. 2011). Plaintiff must demonstrate a "right to the writ is clear and indisputable." *Id.*

The extraordinary relief of mandamus is misplaced. Reilly seeks to overturn and enjoin a pure discretionary decision on national security matters entrusted solely to the Executive. The FBI has no clear duty to act, grant Reilly's clearance, and reinstate her. After all, "no one has a 'right' to a security clearance." *Egan*, 484 U.S. at 528. Like all the other claims, mandamus fails. *Stehney*, 101 F.3d at 929, 934; *Montgomery v.*

25

*Sanders*, No. 3:07-CV-470, 2008 WL 4546262, at \*5 (S.D. Ohio Aug. 18, 2008).

## Conclusion

For all those reasons, the Court should dismiss this action with prejudice.

## Local Rule 3.01(g) Certificate

The parties conferred by phone on February 20. Plaintiff opposes the Motion.

Date: February 20, 2026

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

_____

Kevin R. Huguelet
Assistant United States Attorney
Florida Bar Number 125690
Kevin.Huguelet@usdoj.gov
2110 First Street, Suite 3-137
Fort Myers, Florida 33901
(239) 461-2237