UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

KELLI-ANN REILLY,

      Plaintiff,

    v.

UNITED STATES ATTORNEY
GENERAL, DIRECTOR OF THE
FBI, UNITED STATES
DEPARTMENT OF JUSTICE,
FEDERAL BUREAU OF
INVESTIGATION,

      Defendants,

Case No. 2:25-CV-950-KCD-NPM

_____/

## **ORDER**

This case presents a conflict between individual rights and executive sovereignty. On one side are liberties guaranteed by the First and Fifth Amendments—specifically, the right of a public employee to be free from political viewpoint discrimination and the foundational promise of due process. On the other side sits an equally formidable principle of structural governance: the Executive Branch's exclusive Article II authority to control access to national security secrets. The friction between these two forces becomes acute when, as here, a plaintiff alleges that the Executive Branch used its security clearance process not to protect classified information, but as a pretextual weapon to execute an ideological purge.

The Supreme Court has left little room to maneuver when determining which of these constitutional interests wins out. *See Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988).[1] *Egan* treats national security as a virtually impenetrable executive enclave. The Court held that no judicial body has authority to audit the substance of an underlying security clearance determination when reviewing an adverse employment action. And at least in the Eleventh Circuit, this limitation applies not only to the revocation of a security clearance, but also to decisions made at the suspension or investigatory stage. *Hill v. White*, 321 F.3d 1334 (11th Cir. 2003). "To review the initial stages of a security clearance determination is to review the basis of the determination itself regardless of how the issue is characterized." *Id.* at 1336.

The combined weight of *Egan* and *Hill* dictates the outcome here. Plaintiff Kelli-Ann Reilly sues the FBI and several officials "for politically motivated" retaliation and unlawful termination of her employment. (Doc. 10 ¶2.) She brings a few different claims, but they all center on the same "core issue": "the FBI revoked her security clearance to punish disfavored political viewpoints and enforce ideological conformity." (Doc. 20 at 1.) Under *Hill* and its progeny, if the alleged malfeasance is tied to the security clearance

---

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

pipeline, as here, the inquiry is at an end. *See, e.g.*, *Baisden v. Winter*, No. CV204-212, 2006 WL 717193, at *4 (S.D. Ga. Mar. 20, 2006).

Make no mistake, the factual allegations in this complaint are troubling. Reilly's charge that the FBI transformed its background check process into an instrument for political screening is profoundly troubling. But institutional discomfort cannot hand a federal court jurisdiction it does not possess. Because evaluating Reilly's claims requires inquiry into the security clearance process itself, her case "is not within the jurisdiction of the courts." *Hill*, 321 F.3d at 1335.

## I. Background

Here are the relevant facts from Reilly's complaint, which must be accepted as true at this stage. Reilly worked at the FBI as a financial analyst for twenty-six years. (Doc. 10 ¶¶ 3, 12.) She held a Top-Secret security clearance and successfully passed several periodic security-clearance reviews. (*Id.* ¶¶ 12, 20.) She steered clear of any disciplinary actions or internal misconduct. (*Id.* ¶ 20.) Her record, in short, was spotless. (*Id.* ¶ 21.)

Then the 2020 presidential election happened. Reilly told her supervisor that she felt the election "involved irregularities and might be overturned through lawful judicial processes." (*Id.* ¶ 22.) The institutional reaction was quick. Within a month, her security clearance was suspended. (*Id.* ¶ 25.) As the FBI tells it, she had relayed "baseless conspiracy theories

associated with" possibly violent or criminal organizations. (*Id.* ¶ 27.) Concluding that these viewpoints rendered her "potentially vulnerab[le] to manipulation and coercion," the FBI stripped her security clearance and placed her on unpaid administrative leave pending a full investigation (*Id.* ¶¶ 26-27.)

The FBI Security Division conducted that investigation and probed Reilly on a wide range of politically charged topics. They included not just the 2020 election's legitimacy, but also questions about Covid-19's origin, the efficacy of mask wearing, and Jeffrey Epstein. (*Id.* ¶¶ 30, 32.) Unhappy with her responses, the FBI formally revoked Reilly's security clearance in June 2021. (*Id.* ¶ 35.) The investigation found that she was "delusional" and made "unfounded conspiratorial statements." (*Id.* ¶ 36.) According to the FBI, her personal conduct and psychological condition presented unacceptable risks. (*Id.* ¶¶ 36-37.) Left with her paycheck frozen, her security credentials stripped, and her professional reputation in tatters, Reilly ultimately elected to take early retirement—a choice she contends was no real choice at all, but rather a forced constructive discharge. (*Id.* ¶¶ 46-48.)

Perhaps understandably, Reilly feels persecuted. She now sues the FBI, its director, the United States Attorney General, and the United States Department of Justice (collectively, "the Government"). Her complaint raises

4

a trio of constitutional claims and attaches alternative requests for declaratory or mandamus relief to the back of them.

Reilly first alleges that the FBI "constructively discharged [her] and revoked her" security clearance in direct retaliation for her perceived political alignment, which amounts to viewpoint-discrimination under the First Amendment. (Doc. 10 ¶¶ 66-74.) She then switches to the Fifth Amendment, lodging a procedural due-process challenge against the "unlawful, politically driven litmus test" she claims the FBI deployed to investigate her security clearance. (*Id.* ¶¶ 75-80.) She rounds out the core constitutional charges with a "stigma-plus" due process claim premised on the "false and defamatory smears" regarding her mental stability that the FBI published as part of the investigation. (*Id.* ¶¶ 81-83.) Relying on these underlying constitutional violations, Reilly bootstraps two final claims. First, she seeks a declaratory judgment "to establish that her constructive discharge was a legal nullity." (*Id.* ¶¶ 90-92.) Finally, she requests "a writ of mandamus commanding defendants to return her to her former FBI employment." (*Id.* ¶¶ 94-95.)

The Government moves to dismiss her claims for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1). (Doc. 17.)

## II. Legal Standard

Rule 12(b)(1) provides the vehicle for a party to contest a federal court's subject matter jurisdiction. *See Watson v. Kingdom of Saudi Arabia*, 159

F.4th 1234 (11th Cir. 2025). Such challenges come in two forms: "facial attacks" or "factual attacks." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). Facial attacks require the court look only at the complaint to see whether the "plaintiff has sufficiently alleged a basis for subject matter jurisdiction." *Id.* at 529. A complaint's allegations "are taken as true for the purposes of" this analysis. *Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1261 (11th Cir. 1997). "Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings[.]" *Id.* Where a complaint's allegations facially fail to present a justiciable case or controversy, it must be dismissed. *Elend v. Basham*, 471 F.3d 1199, 1202 (11th Cir. 2006).

### III. Discussion

The Government wages a facial attack on Reilly's complaint. It contends her claims invite judicial second-guessing of its revocation decision. And it insists that decision is unreviewable under *Egan*. Reilly, for her part, tries to thread the needle. While conceding that the revocation itself is unreviewable, she stresses that her constitutional claims arising from the revocation process are still fair game.

The Government's got it right here. *Egan* held that the decision to deny or revoke a security clearance belongs solely to the Executive Branch. 484 U.S. at 527-28. The Court observed that such decisions fall squarely within

the President's core powers under Article II, § 2 of the Constitution. *Id.* at 527. It interpreted that section to award the Executive Branch unfettered authority over who may or may not be made privy to government secrets. *Id.* And it stressed how impossible it would be "for an outside nonexpert body" to referee such "sensitive and inherently discretionary judgment call[s]." *Id.* at 527-28. *Egan's* instruction is thus clear: only the Executive Branch gets to decide who gets a security clearance, and the judiciary cannot interfere with those decisions.

While some courts have read *Egan* as leaving room for claims attacking the security clearance *process* apart from the ultimate decision, the Eleventh Circuit has not. In *Hill*, it found the decisions underlying a revocation determination just as off-limits as the revocation itself. 321 F.3d at 1336. The panel put it simply: "To review the initial stages of a security clearance determination is to review the basis of the determination itself regardless of how the issue is characterized." *Id.* The Eleventh Circuit has doubled down on its expansive reading twice this past decade. *See Murphy v. Sec'y, U.S. Dep't of Army*, 769 F. App'x 779, 782 (11th Cir. 2019) ("[W]e have extended *Egan* to apply not only to final denials or revocations of security clearances, but also to decisions made at the suspension or investigatory stage[.]"); *Paschal v. Sec'y of the Army*, 648 F. App'x 898, 899 (11th Cir. 2016) ("For essentially the reasons stated by the able district judge," *i.e.*, that *Hill*

precludes review of a claim that unlawful discrimination motivated investigation into and suspension of plaintiff's security clearance, "we affirm.").

Against this backdrop, our hands are tied. This Court cannot entertain claims targeting the preliminary, investigatory, or final stages of a security clearance revocation, no matter how artfully framed. *See Murphy*, 769 F. App'x at 782. To hold otherwise would run headlong into *Hill*'s core structural command that prohibits judicial oversight of the security clearance process. *See Mowery v. Nat'l Geospatial-Intel. Agency*, 42 F.4th 428, 438 (4th Cir. 2022) ("[I]f permitted to review the initial stage of a security clearance determination to ascertain whether it was a retaliatory act, the court would be required to review the very issues that the Supreme Court has held are non-reviewable[.]").

Yet that is precisely what Reilly seeks. Although she carefully dresses her grievances in the language of independent constitutional violations, each calls on this Court to audit an unreviewable executive pipeline. Her First Amendment claim takes direct aim at not only the final revocation but also the decision to launch the background check in the first place. (*See* Doc. 10 ¶ 71.) Yet that maneuver runs headlong into *Hill*'s explicit command that the opening stages of an investigation are structurally inseparable from its final conclusion. 321 F.3d at 1336. Her due process counts fare no better, targeting

8

the mechanics of the investigatory phase and the specific findings underlying the FBI's security assessment. (*See* Doc. 10 ¶¶ 79, 83.) To evaluate whether those investigative steps were a politically motivated sham, or whether those psychological findings were false and defamatory, the factfinder would have to dissect the FBI's process and decision-making—the very diagnostic task *Egan* takes off the table. *See, e.g.*, *Hall v. U.S. Dep't of Lab., Admin. Rev. Bd.*, 476 F.3d 847, 853 (10th Cir. 2007).

The same problem infects her claims for mandamus and declaratory relief. Those counts do not offer a separate lifeline; they piggyback entirely on the underlying security clearance conduct discussed above. In asking this Court to declare her constructive discharge a legal nullity or to issue an extraordinary writ forcing her reinstatement, Reilly is again asking this Court to rewrite the operational consequences of an executive national security decision. *See United States ex rel Johnson v. Raytheon Co.*, 93 F.4th 776, 785 (5th Cir. 2024) ("[J]udicial review is not permitted over decisions that implicate the Executive's Article II powers to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy.").

Boiled down, Reilly's lawsuit is a direct assault on the FBI's motives. Her complaint is saturated with allegations attacking the basis of her clearance investigation, suspension, and ultimate revocation. In her own

9

words, the FBI's investigation was a "politically motivated" (Doc. 10 ¶ 2), "pretextual" (¶ 3) "ideological inquisition" (¶ 4) designed "to probe [her] political beliefs" (¶ 31) in "retaliation" (¶ 2) for her being "politically affiliated with President Trump" (¶ 71). The FBI denies that politics or retaliation played any role in its decisions. So for this case to proceed, a factfinder would have to weigh these competing assertions and determine who is telling the truth. And the FBI would have to defend and explain its security clearance determinations, along with the motivations driving its investigation. That is simply a dead end under *Hill* and its progeny. *See, e.g., Hambrick v. Esper*, 290 F. Supp. 3d 1271, 1279 (N.D. Ala. 2018).

Reilly offers several arguments to slip past *Egan* and *Hill*. None are persuasive. She first pushes a Supreme Court decision that came only months after *Egan*: *Webster v. Doe*, 486 U.S. 592 (1988). As she tells it, "*Webster* preserves constitutional review of clearance decisions." (Doc. 20 at 7.)

But *Webster* addressed the reach of a statute that gave the CIA director sweeping authority to terminate an employee whenever he deemed it "necessary or advisable in the interests of the United States." 486 U.S. at 594. The Court held that while this language committed the firing to absolute agency discretion—effectively blocking standard administrative challenges—it did not strip federal courts of jurisdiction to hear colorable constitutional

10

claims. *Id.* at 601, 603. For Congress to completely insulate constitutional grievances from judicial scrutiny in the employment context, the Court concluded, its intent to do so must be expressed with unmistakable clarity. *Id.* at 603. Thus, *Webster* established a clear-statement hurdle for precluding constitutional review of an employee's claims that an intelligence agency's personnel actions violated her rights.

*Webster* did not touch, let alone undermine, the structural underpinnings of *Egan*. The jurisdictional bar in *Egan* does not turn on congressional authority or statutory interpretation. It rests on the inherent, textually committed authority of the executive under Article II to protect national secrets. Because *Webster* never reached that constitutional question—and never disputed the executive's exclusive province to assess national security risks—it leaves *Egan*'s core logic undisturbed. *See Lee v. Garland,* 120 F.4th 880, 888 (D.C. Cir. 2024) ("*Webster* did not consider claims that might impinge on the President's core Article II powers as the head of the Executive Branch and as Commander in Chief.").

Reilly next stresses that her claims concern "fundamental constitutional rights," whereas *Egan* addressed a statutory employment dispute. (Doc. 20 at 11.) But that is a distinction without a difference. As mentioned, *Egan* is premised on the separation of powers. It recognizes that Article II properly commits decisions on security clearances to the Executive

11

Branch, not to be reviewed by an outside body such as an Article III court. *Egan*, 484 U.S. at 527. In other words, the Constitution commands a true separation of powers with respect to security clearance decisions. That structural concern remains fully active whether a plaintiff proceeds under a congressional statute or invokes the Constitution itself. Changing the legal label does not alter the operational reality of what the court is being asked to do. Because Reilly targets the security clearance process, "*Egan* triggers application of the political question doctrine, which forecloses review of [her] constitutional claims." *Lee*, 120 F.4th at 888.

To be sure, a handful of courts have considered this issue and declined to stretch *Egan* far enough to swallow constitutional claims. *See, e.g.*, *El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 183 (3d Cir. 2010). The anxiety driving those decisions is easy enough to understand. Nobody is eager to hand the Executive Branch what looks like a blank check to bypass constitutional guarantees in this arena. But whatever the wisdom of those cases, they do not write the law for this circuit. *Egan* carved out a national security enclave, and the Eleventh Circuit has endorsed its most expansive boundaries. *See Hambrick*, 290 F. Supp. 3d at 1279. If Congress (or a higher court) wants to recalibrate this structural balance and allow review of security clearance decisions, it is entirely free to do so. *See Egan*, 484 U.S. at 530. Until those bodies choose to act, however, "we must apply *Egan*

12

according to its terms." *Rattigan v. Holder*, 689 F.3d 764, 776 (D.C. Cir. 2012) (Kavanaugh, J., dissenting).

## IV. Conclusion

Because every count in Reilly's complaint—whether framed as a constitutional violation or an equitable plea for mandamus—ultimately requires this Court to referee the motives and merits of an executive security clearance decision, the Constitution draws an absolute line that cannot be crossed. Under *Egan* and *Hill*, this Court lacks the structural authority to handle that diagnostic task, leaving no choice but to step aside. Accordingly, the Government's Motion to Dismiss (Doc. 17) is **GRANTED**, and this case is dismissed for lack of jurisdiction. The Clerk is **DIRECTED** to enter judgment, terminate any pending motions or deadlines, and close the case.

**ORDERED** in Fort Myers, Florida on June 18, 2026.

Kyle C. Dudek
United States District Judge

13